

**IT IS HEREBY ADJUDGED and DECREED that the below described is SO ORDERED.**

**Dated: July 08, 2022.**

_____
**CRAIG A. GARGOTTA**
**CHIEF UNITED STATES BANKRUPTCY JUDGE**

---

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 21-50192-cag |
| | § | |
| VEST C. WOMACK and | § | |
| CHERYL WOMACK, | § | |
|     Debtors. | § | CHAPTER 7 |
| | § | |
| | § | |
| TEXAS CAPITAL BANK, N.A., | § | |
|     Plaintiff | § | |
| v. | § | ADVERSARY NO. 21-05071-cag |
| | § | |
| VEST C. WOMACK and | § | |
| CHERYL WOMACK, | § | |
|     Defendants. | § | |

### MEMORANDUM OPINION AND ORDER ON PLAINTIFF'S COMPLAINT FOR NONDISCHARGEABILITY OF DEBT AND FOR MONEY JUDGMENT (ECF NO. 1)

Came on to be considered on April 27, 2022, the trial on the merits on Plaintiff Texas

Capital Bank, N.A.'s Complaint for Nondischargeability of Debt and for Money Judgment (ECF

No. 1)[1] ("Complaint"). This Court has subject matter jurisdiction over this matter pursuant to 28

---

[1] "ECF" refers to the electronic case file docket number.

U.S.C. §§ 157(a) and 1334. This matter is referred to this Court under the District's Standing Order on Reference. This adversary proceeding is a core proceeding under 28 U.S.C. §§ 157(b)(1) and (b)(2)(I) (determination of dischargeability of debts). Venue is proper in the Western District of Texas under 28 U.S.C. § 1409. The following is the Court's findings of fact and conclusions of law under Fed. R. Bankr. P. 7052(a)(3)[2]. Texas Capital Bank, N.A. ("Bank") filed its Statement Regarding Consent (ECF No. 14) which consents to the entry of final orders and a final judgment by this Court. Defendants Vest C. Womack and Cheryl Womack ("Womacks") filed their Statement Regarding Consent (ECF No. 18) which likewise consents to the entry of final orders and a final judgment by this Court. For the reasons stated in this Memorandum Opinion and Order, the Bank's claims for relief are GRANTED IN PART and DENIED IN PART.

## BACKGROUND[3]

The dispute in this case arises from a business owned by the Womacks called ME Interests, LP d/b/a First Service Technology ("ME Interests"). ME Interests was owned by the Womacks and primarily provided technology installation and maintenance services to local schools. ME Interests and a related entity called ME Interests Management, LLC sought to refinance their current debt and on September 28, 2017 executed a Small Business Administration ("SBA") note in the amount of $1.33 million with the Bank as the lender. The Womacks personally guaranteed the ten-year-term note. In connection with the loan, the Womacks signed a loan agreement stating that the Womacks "shall not, at any time and for any reason, cease to be involved in the day-to-day executive management of [ME Interests] except by reason of death, disability or retirement." The loan agreement also stated "[n]o more than 10% of the record or beneficial ownership of [ME

---

[2] The Federal Rules of Bankruptcy Procedure shall be referred to as the "Bankruptcy Rule(s)" unless otherwise noted.
[3] The Background Section of this Memorandum Opinion is derived from Plaintiff's Complaint (ECF No 1).

Interests] shall have been transferred, assigned or hypothecated to any person, when compared to such ownership as of the date hereof."

In December 2018, the Womacks sold their interest in ME Interests to an entity named Restoration Risk Management, LLC ("Restoration"). The sales agreement called for the Womacks to receive an initial payment and two subsequent payments. The agreement also stated that Mr. Womack was to serve as a consultant to Restoration at a salary of $10,000 per month for one year. At the closing of the sale, the Womacks received the initial payment of $650,000. Shortly after the sale, the Womacks defaulted on the note for lack of payment. The Bank received no proceeds of the sale, and the Bank was not notified of the sale. The Bank first came to know about the transaction in May 2019 during a meeting between Mr. Womack and the Bank in which the Womacks' default was discussed. The amount due and owing to the Bank is $1,098,360.22[4].

## PARTIES' CONTENTIONS

The Bank brings forth two causes of action, both arising under 11 U.S.C. § 523[5]. The first, is a cause of action under § 523(a)(2), alleging that the Womacks obtained the loan from the Bank under false pretenses, by giving false representations, and acting with actual fraud. The Bank asserts that the Womacks misrepresented their true intentions regarding whether they were going to sell the business or be involved in the day-to-day operations in order to obtain the loan. The Bank also asserts that various misrepresentations were made by the Womacks throughout the loan approval process. On this cause of action, the Bank seeks a finding that the Womacks' debt to the Bank is nondischargeable.

Additionally, the Bank alleges a claim under § 523(a)(6), claiming that the Womacks

---

[4] This amount represents the amount due and owing on the note at the time of the filing of the adversary. At trial, there was uncontroverted evidence that the amount due and owing at the time of trial was $1,237,679.20.
[5] Unless otherwise indicated, all section references are to Title 11 U.S.C.___ et. seq.

caused the Bank a willful and malicious injury. According to the Bank, the Womacks' sale of the business and failure to notify the bank of the sale or remit any of the proceeds to the Bank are direct violations of the loan agreement and therefore a willful and malicious injury. The Bank seeks relief under this cause of action in the amount of $650,000.00, the amount of the sales proceeds that the Womacks received.

The Womacks deny that the failure to pay the Bank the sales proceeds was an attempt to conceal the sale. The Womacks further deny that the failure to pay was done with malicious intent or conscious disregard for their duties to pay the note without excuse. Lastly, the Womacks deny any allegations that the loan from the Bank was obtained through any false pretenses, misrepresentations, or fraud.

### CROSS MOTIONS FOR SUMMARY JUDGMENT

Shortly after the initial pleadings were filed in this adversary, the Womacks filed a Motion for Summary Judgment (ECF No. 36). The Womacks' motion argued that three undisputed sets of facts conclusively foreclose any allegations of willful and malicious injury: (1) after the Womacks disclosed the sale to the Bank, the Womacks made payments on the note totaling $220,296.67; (2) the Bank entered into two loan modification agreements with the Womacks, in which the Bank agreed to defer payments for a period of time; and (3) the Womacks executed an assignment of proceeds in favor of the Bank should any monetary relief be granted to the Womacks in their state court litigation against Restoration.

Further, the Womacks argued that Mr. Womack was not aware of his obligation to notify the Bank of the sale of his company. Because the sale agreement with the buyer of the company required that the buyer assume the loan and make payments to the Bank, Mr. Womack was of the opinion that his obligations were discharged. When the business deal went south, Mr. Womack

4

approached the Bank and notified the bank of the sale. It is then that the Bank executed the two previously mentioned loan modifications with the Womacks. The Womacks also argue that all the subsequent payments to the Bank were made from proceeds of the sale. If this were the case, then there would be no basis for a nondischargeability action against the Womacks.

On December 21, 2021 the Bank filed Plaintiff's Response to Defendants' Motion for Summary Judgment and Cross Motion for Summary Judgment (ECF No. 38). In it, the Bank explained that there are enough facts present to sustain a viable cause of action under 523(a)(6). Specifically, the Bank cited Fifth Circuit law arguing that the Bank can show a willful and malicious injury under 523(a)(6) by showing that the Womacks committed conversion in a willful and malicious manner. The evidence for this conversion—the Bank claims—comes from the Womacks' failure to inform the bank of the sale of ME Interests and subsequent failure to pay the sales proceeds to the Bank. The Bank attacked the Womacks' assertion that he did not know that he had to pay any of the sales proceeds to the Bank by pointing out that Mr. Womack signed the loan documents without reading them. Lastly, the Bank pointed to Mr. Womack's deposition testimony stating that he received $300,000 cash from the sale, and that he deposited the money into three different personal accounts.

The Court held a hearing to announce its ruling on the dueling summary judgment motions on March 7. While noting that it was a close call, the Court concluded that there was a lack of summary judgment evidence regarding intent. The Court also indicated that there were insufficient facts available about the transactions between the parties. For example, it was unclear why the Bank granted loan modifications on two separate occasions. Additionally, it was unclear what happened to the money the Womacks received from the sale of the business if none of those proceeds went to the bank. Accordingly, the Court denied both summary judgment motions and

5

the case went to trial on both § 523 claims.

### STIPULATIONS OF FACT PURSUANT TO JOINT PRE-TRIAL ORDER

The parties submitted a joint pre-trial order in advance of trial (ECF No. 38) in which the parties stipulated to the following facts:

The Womacks filed their Chapter 7 bankruptcy case on February 25, 2021. At the time of filing, the Womacks were 95% owners of an information technology company called ME Interests, LP, d/b/a First Service Technology. ME Interests began operations in January of 2008. On September 28, 2017, the Womacks—on behalf of ME Interests—executed an SBA note and loan agreement with the Bank. The amount of the note was $1.33 million, and the term was ten years. The Womacks signed personal guaranties for the note and also executed a security agreement, thereby securing the note against ME Interests' accounts receivable, chattel paper, general intangibles, and proceeds.

The loan agreement provides that the Womacks "shall not at any time and for any reason, cease to be involved in the day-to-day executive management of [ME Interests], except by reason of death, disability or retirement." Further, the loan agreement stated that "no more than 10% of the record or beneficial ownership of [ME Interests] shall have been transferred, assigned or hypothecated to any person, when compared to such ownership as of the date hereof."

On August 3, 2018, the Womacks sold 85% of their ownership interest in ME Interests to a company called Restoration. At some point before the sale, the Womacks engaged Benchmark International CSS, LLC ("Benchmark") to broker the sale of the business. The Womacks did not pay any of the proceeds from the sale to the Bank. After the sale, ME Interests continued to make monthly payments on the note to the Bank. The Bank was not notified of the sale when it was finalized and was not informed of the sale by the Womacks until May 2019.

6

After the Womacks notified the Bank of the sale, the Bank executed two different loan modifications, granting the Womacks deferments on the loan payments. The Womacks eventually defaulted on the Note and the personal guaranties.

Within weeks of the sale, the buyers breached the Purchase and Sale Agreement and excluded Mr. Womack from the business. Shortly thereafter, the buyers and the Womacks entered into a settlement agreement that terminated the Womacks' ownership interest and participation in the company. Due to the breach of the purchase agreement by the buyers, the Womacks sued the buyers in state court and this action still remains pending.

### FINDINGS OF FACT

Pursuant to the pre-trial order the parties stipulated to the admission of certain exhibits. In the end, all of the exhibits brought by both parties were admitted into evidence (P's Ex. 1-20[6] & D's Ex. 1-15). Three witnesses testified: Clyde Thompson, Vest (Calvin) Womack, and Cheryl Womack. The Court weighs the testimony of Thompson more heavily because the Court found his testimony more credible and persuasive.

Clyde Thompson

Thompson is employed as a credit officer of the SBA group at Texas Capital Bank, a job he has maintained for approximately 6 years. Thompson earned a Bachelor's in Business Administration and Finance from the University of Texas in 1998 and has over 30 years of experience in the banking industry, a majority of those years working with SBA loans. Thompson testified that his main duty at the Bank is to approve or deny all SBA credit requests. As part of those duties, Thompson was involved with the loan to the Womacks from the beginning of the process until the loan was consummated in September 2017.

---

[6] Plaintiff's Exhibit 20 was introduced during the course of the trial and admitted into evidence as an impeachment exhibit.

Thompson testified that the $1.33 million loan that ME Interests obtained from the Bank was intended to consolidate existing business debt and refinance that debt under an SBA loan. This strategy would lower the monthly payments, which in turn would give the business an opportunity for continued growth. As part of the loan process, the Womacks executed a security agreement with the Bank granting the Bank a security interest in all business assets including accounts receivable, inventory, furniture, fixtures, and general intangibles.[7] In addition to this security interest, the Bank also obtained personal guaranties from the Womacks in their individual capacities.[8] Thompson represented that at the time the loan was made, the Womacks represented to the Bank that ownership of ME Interests was divided as follows: 51% for Mrs. Womack, 43% for Mr. Womack, 5% for John Templeton, and 1% for an entity owned 50/50 between Mr. and Mrs. Womack.

Thompson explained that it is common practice to require certain covenants to be executed by the borrowers so that the Bank can ensure the businesses to which the Bank loans money would continue to operate in the manner in which the loan was approved. In accordance with this practice, the loan agreement contains a clause in which the Womacks agreed that they shall not at any time cease to be involved in the executive management of ME Interests.[9] Thompson explained that the Bank requires these covenants from small businesses in particular because the Bank relies on the management abilities and operations of the business when deciding to approve a loan. Thompson testified that the Bank also requires a covenant that no more than 10% ownership interest can be transferred because the SBA requires that any person who owns 20% or more of the business personally guaranty the note.

---

[7] *See* Plaintiff's Ex. 3 (Security Agreement).
[8] *See* Plaintiff's Ex. 4 (Personal Guaranty of Mr. Womack) and Plaintiff's Ex. 5 (Personal Guaranty of Mrs. Womack).
[9] *See* Plaintiff's Ex. 2 (Loan Agreement).

Next, Thompson explained that Mr. Womack's April 2019 payment on the note was returned for insufficient funds. When the Bank called Mr. Womack for an explanation, Mr. Womack explained that he had sold the business and was having a dispute with the buyers. Thompson said he then scheduled a meeting on May 10, 2019 with Mr. Womack and Thompson's colleague at the Bank, John Gannon, to discuss a possible resolution. When asked about Plaintiff's Exhibit 10, Thompson identified it as a written memorial of the meeting with Mr. Womack. Thompson recounted that Mr. Womack told him the following things during this meeting:

    a.  Mr. Womack had entered into a contract in August 2018 to sell 85% ownership interest in ME Interests to Restoration.

    b.  Mr. Womack had received funds from the sale.

    c.  Mr. Womack had marketed the business for sale for nearly a year before ultimately selling it to Restoration.

    d.  Within two weeks of the sales contract being executed, the business relationship between Mr. Womack and the buyers became untenable.

    e.  Mr. Womack retained some interest in the business and was to be paid for consulting, but the buyers had locked him out of the offices of ME Interests and taken control of the business.

    f.  Mr. Womack implored the Bank to work with him because Mr. Womack was taking legal action to regain control of the business from the buyers and Mr. Womack was optimistic that he could continue to repay the note.

Thompson testified that during the meeting, he asked Mr. Womack how much money Mr. Womack had received from the sale and what Mr. Womack did with the proceeds. Thompson

relayed that Mr. Womack was vague in his answers to these questions and said that the proceeds were "gone."

Accordingly, Mr. Thompson testified that the Bank entered into two separate loan modifications with the Womacks. Thompson testified that the loan modifications came about because of the SBA's guidelines that encourage banks to work with borrowers instead of taking legal action right away. The first was dated June 6, 2019 and stipulated that monthly payments would be deferred for a period of three months, at the expiration of which monthly payments would resume.[10] Mr. Thompson admitted that Mr. Womack performed his duties with regard to this loan modification agreement. The second loan modification took effect on November 5, 2019 and stated that interest-only payments were to be made from November 5, 2019 until May 5, 2020.[11] Mr. Thompson acknowledged that Mr. Womack performed his duties pursuant to this loan modification as well.

During cross examination, it was revealed that the Bank has an agreement with the SBA in which the SBA partially guarantees up to 75% of the note if the Bank has exhausted all its remedies to recover on the note.[12] Further, Thompson was forthcoming with the fact that despite remedies being available to the Bank in the loan agreement, the Bank chose not to take legal action against the Womacks when the Bank discovered the sale. Thompson also admitted that he had no evidence or personal knowledge that the Womacks were marketing the business, intended to sell the business, or intended to cease management of the day-to-day operations when they obtained the loan. Additionally, Thompson admitted that Mr. Womack never denied liability on the note and maintained contact with representatives from the Bank to update them on the status of the litigation

---

[10] *See* Plaintiff's Ex. 18 (June 3, 2019 Loan Modification Agreement).
[11] *See* Plaintiff's Ex. 19 (November 5, 2019 Loan Modification Agreement).
[12] Plaintiff's Ex. 2 at 2.

that Mr. Womack initiated against the buyers of the company. Thompson also admitted that the Bank had accepted payments totaling $120,218.65 from Mr. Womack after the default.[13] Thompson also testified that Mr. Womack had followed through on his commitments with regard to the loan modifications.

Vest (Calvin) Womack

Mr. Womack is one of the joint debtors in this bankruptcy case. Mr. Womack is a Navy Veteran and although he never received a formal master's certificate, Mr. Womack was enrolled in a master's program for business management. Before founding ME Interests, Mr. Womack had various jobs in the finance and banking industry.

Mr. Womack's testimony was often evasive, inconsistent, and hard to follow. Mr. Womack frequently had trouble recalling details and mentioned that he had memory problems. As such, the Court weighs Mr. Womack's testimony as less credible.

Mr. Womack testified that he started ME Interests in approximately 2008 as a part time venture. At the time, the company sold computers, laptops, and desktops as well as provided security solutions for schools such as camera and fire alarm systems. Mr. Womack testified that he began communications with the Bank in 2017 but could not recall whether he initially received a line of credit or if he immediately applied for the SBA loan that is at issue in this case. Mr. Womack testified that the reason for the loan was to consolidate outstanding loans he had with other lenders. Mr. Womack said he also used some of the loan proceeds as working capital because the business was growing rapidly at the time of the loan.

Mr. Womack testified that the 2016 article in the San Antonio Business Journal[14] was written about ME Interests because at the time, the Womacks were advertising their business as

---

[13] *See* Plaintiff's Ex. 16 (Lender's Transcript of Account).
[14] Plaintiff's Ex. 1.

majority woman-owned. Mr. Womack, however, made contradictory statements regarding whether Mrs. Womack had any ownership interest. Mr. Womack initially said that at the time of the article, Mrs. Womack owned 51% of the company, but when confronted with the sale documents[15] which stated that he had sold his 85% interest, Mr. Womack stated that he was unsure whether Mrs. Womack ever had an ownership interest in the company. Furthermore, in order for ME Interests to be considered a woman owned business, Mrs. Womack needed to work with the business on a full-time basis, which she was unprepared to do because she was going back to her job as a teacher. Mr. Womack ultimately admitted that Mrs. Womack was not involved in the business. Consequently, the Womacks chose not to pursue official designation as a majority woman owned business. Mr. Womack denied that the article increased interest in buying the business or that the reason for consolidating the debt via the SBA loan was aimed at increasing the value of the business.

When asked, Mr. Womack stated that the first time he thought about selling his business was in January 2018 when he was approached by Benchmark. Mr. Womack stated that Benchmark gave him a persuasive marketing pitch that his business was worth $5-8 million. Mr. Womack agreed to have Benchmark market his business for sale and he received offers through this process from April until August of 2018. Ultimately, Mr. Womack sold the business for $2.6 million, though some of the value included in the final sales price was an assumption of outstanding debt, including the debt to the Bank. Mr. Womack did not have an answer when asked why he ultimately sold the business for much less than the broker originally represented the value of the business as.

When asked when he first notified the Bank of the sale, Mr. Womack testified he informed the Bank of the sale three weeks after the sale had taken place on advice of counsel. This testimony

---

[15] Plaintiff's Ex. 7.

is inconsistent with the stipulation in the pre-trial order that the Bank first learned of the sale at the May 2019 meeting between Bank representatives and Mr. Womack.

Mr. Womack was next asked about how much money he received from the sale of the business. His answers were confusing and not clearly expressed. Mr. Womack admitted that the Bill of Sale said that the Womacks were to receive an initial payment of $650,000 as part of the sale.[16] When asked, Mr. Womack testified that the buyers deposited $650,000 into the company's checking account but he only received $350,000 because he had already taken $300,000 out of the business account earlier that year. Mr. Womack maintained that he only took $350,000 out after the sale because he did not want to treat the buyers unfairly or take more out of the company than he felt was justified. The reasons for this arrangement were unclear.

Mr. Womack testified that of the $350,000 he received at the time of the sale, $100,000 was deposited into a joint checking account owned by the Womacks[17], $100,000 into an account held by the "Calvin Womack Special Community Property Trust"[18], and $150,000 into an investment account owned by the Womacks[19]. Mr. Womack also testified that the previous $300,000 he took out of the company's checking account was used for living expenses, attorney's fees, and paying back the loan after the buyers defaulted.

Mr. Womack testified that it never occurred to him to pay any of the sales proceeds to the Bank because it was his priority to negotiate an assumption of the loan payments when the business was sold. He insisted that he never intended for the Bank to not be paid. Mr. Womack was vague with his answers as to how the business relationship with the buyers deteriorated but reiterated that

---

[16] *See* Plaintiff's Ex. 8 (Bill of Sale).
[17] *See* Plaintiff's Ex. 12 (Statement of a Bank of America account registered to the Cheryl Womack Special Community Property Trust).
[18] *See* Plaintiff's Ex. 14 (Statement of a Navy Federal Credit Union account registered to the Calvin Womack Special Community Property Trust).
[19] *See* Plaintiff's Ex. 15 (Statement of an E-Trade account registered to both Vest Womack and Cheryl Womack).

he was physically locked out of the business shortly after the parties finalized the sale. Mr. Womack indicated that he sued both Restoration and Benchmark in state court and assigned any monetary recovery from the lawsuit to the Bank.

Mr. Womack stated that as soon as he found out about the buyers' default, he stepped in to service the loan as he was able. Mr. Womack testified that he felt an obligation to continue servicing the note because of he intended to honor the personal guaranty he signed. Mr. Womack made clear that it was never his intention to harm the Bank. He eventually was unable to continue servicing the loan, which led to the decision to file for bankruptcy protection. Mr. Womack noted that filing for bankruptcy was a last resort and he preferred that the Bank work with him.

Cheryl Womack

Mrs. Womack is the other joint debtor in the bankruptcy case. Mrs. Womack has a degree in education and has 16 years of experience as an educator. She is currently the principal at San Antonio Christian School.

Mrs. Womack testified that her involvement in the company was limited to basic invoicing, errands, and chores around the office. When asked if these tasks would qualify her as being involved in the executive management of the company as required by the loan agreement, Mrs. Womack answered that she considered her limited role as still assisting with executive management. She also stated that she had no part in the decision to obtain the loan from the Bank despite her signature on the loan documents.

Mrs. Womack corroborated Mr. Womack's testimony that despite the business journal article calling ME Interests a majority woman-owned business, the requirements for that designation were too onerous on Mrs. Womack and the Womacks decided not to pursue that designation.

14

Mrs. Womack admitted that she had no involvement in the sale of the business and the only information she received regarding the transaction was told to her by Mr. Womack. Mrs. Womack testified that she never knew how much money the Womacks received from the sale. Moreover, Mrs. Womack stated that she did not know where the $100,000 that was deposited into her Bank of America account came from. Mrs. Womack was evasive when asked whether her expenses in the two-year period between the sale and the bankruptcy added up to the total amount that was received from the sales proceeds and simply stated that the money was used for living expenses and attorney's fees. She could not recall where the rest of the money went.

Mrs. Womack stated that she was never concerned that the note could go into default and her personal guaranty be called upon because she trusted that Mr. Womack was ensuring that the note was being serviced. Mrs. Womack also said that it was never her intention to harm the Bank.

### CONCLUSIONS OF LAW

The Court makes the following conclusions of law:

An individual may not obtain discharge of debts incurred through his own wrongful conduct. *In re Tegeler*, 586 B.R. 598, 635 (Bankr. S.D. Tex. 2018). A debt may not be discharged under Chapter 7 of the Code if the debt is for money, property, services, or an extension, renewal, or refinancing of credit to the extent obtained by false pretenses, a false representation, or actual fraud under § 523(a)(2)(A), or if a debtor's conduct is willful and malicious as defined under § 523(a)(6).

The standard of proof in a § 523(a) dischargeability action is by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 291 (1991). Thus, the Bank must show by a preponderance of the evidence that the Womacks obtained the loan from the Bank under false pretenses, through false representations, or through actual fraud or that the Womacks willfully and

maliciously caused the Banks's injuries.

**I. Exception to Discharge Under § 523(a)(2)(A) for False Pretenses, False Representations, or Actual Fraud**

Under § 523(a)(2)(A), debts "for money, property, services, or an extension, renewal, or refinancing of credit" are not dischargeable if the debt was "obtained by false pretenses, a false representation, or actual fraud." 11 U.S.C. § 523(a)(2)(A). For a creditor to succeed in a nondischargeability action under § 523(a)(2)(A), the creditor must prove (1) that the debtor made a representation; (2) that the debtor knew was false; (3) that the debtor made with the intent to deceive the creditor; (4) that the creditor actually and justifiably relied upon; and (5) that the creditor sustained a loss as a "proximate result" of its reliance. *Gen. Elec. Capital Corp. v. Acosta (In re Acosta)*, 406 F.3d 367, 372 (5th Cir. 2005) (citing *In re Mercer*, 246 F.3d 391, 403 (5th Cir. 2001)). The creditor must prove all five elements by a preponderance of the evidence. *Id*.

Here, the Bank brought claims under § 523(a)(2)(A) for false representations, false pretenses, and actual fraud**.** The Supreme Court historically construes claims under § 523(a)(2)(A) to include the "elements that the common law has defined them to include." *Husky Int'l Elecs., Inc. v. Ritz*, 578 U.S. 355, 360 (2016) (quoting *Field v. Mans*, 516 U.S. 59, 69 (1995)). Moreover, the Fifth Circuit utilizes a chronological basis to distinguish the elements of actual fraud from false pretenses and false representations. *In re Rifai*, 604 B.R. 227, 307 (Bankr. S.D. Tex., 2019) (citing *Recoveredge, L.P. v. Pentecost*, 44 F.3d. 1284, 1293(5th Cir. 1995)). Accordingly, this Court considers the Bank's allegations under the Fifth Circuit's two tests.

For the second element under § 523(a)(2)(A), the creditor must prove an intent to deceive. *Friendly Fin. Service - Eastgate v. Dorsey (In re Dorsey)*, 505 F.3d 395, 399 (5th Cir. 2007). A court may infer the requisite intent from a "reckless disregard for the truth or falsity of a statement combined with the sheer magnitude of the resultant misrepresentation." *Acosta*, 406 F.3d at 372

(citing *In re Norris*, 70 F.3d 27, 30 n.12 (5th Cir. 1995)); *See also **In re Miller**, 39 F.3d 301, 305

(11th Cir. 1994) (considering the totality of the circumstances to determine the debtor's intent). In

other words, an intent to deceive may be inferred where a debtor makes false representation with

the knowledge that the statement will induce the creditor to act. ***Manheim Auto. Fin. Servs., Inc.***

***v. Hurst (In re Hurst)***, 337 B.R. 125, 133 (Bankr. N.D. Tex. 2005). Therefore, when reviewing

the "intent" element of a dischargeability exception, the court must "consider whether the

circumstances, as viewed in the aggregate, present a picture of deceptive conduct by the debtor,

indicating an intent to deceive the creditor." ***Id.*** Additionally, when a debtor acts with desire to

cause a certain result or with the belief that a result is substantially certain to occur, the debtor

intends that result. ***Id.***

Furthermore, the creditor must prove both actual reliance and justifiable reliance which are

determined by two different standards. Actual reliance is the equivalent of causation-in-fact, which

is defined as a "substantial factor in determining the course of conduct that results in . . . loss."

***Mercer***, 246 F.3d at 413 (emphasis removed) (citing RESTATEMENT (SECOND) OF TORTS § 537

cmt. a (AM. L. INST. 1977)). This level of reliance "requires little of the creditor." ***Mercer***, 246

F.3d at 413 (citing ***City Bank & Trust Co. v. Vann (In re Vann)***, 67 F.3d 277, 284 (11th Cir.

1995)). In the case of loan refinancing fraud, "an issuer usually will be able to establish actual

reliance by showing it would not have approved the loan in the absence of debtor's promise."

***Mercer***, 246 F.3d at 411.

On the other hand, justifiable reliance, described as "an intermediate level of reliance," is

a subjective standard that is more relaxed than the objective reasonable reliance standard. ***Field***,

516 U.S. at 74. This standard does not remove reasonableness from the equation, however, "for

the greater the distance between the reliance claimed and the limits of the reasonable, the greater

the doubt about reliance in fact." *Id.* at 76. Reliance is justifiable, rather, if (1) the promisor intends to perform, and (2) the promisee has reason to believe that the agreement will be carried out. *Mercer*, 246 F.3d at 416 (citing RESTATEMENT (SECOND) OF TORTS § 544). The court must look at both elements from the perspective of the promisee, meaning the first element is not focused on whether the promisor truly intends to perform, but whether the promisee is justified in believing that the promisor intends to perform. *Id.* The second element focuses whether any obstacle or physical impossibility makes it impossible for the agreement to be carried out. *Id.* If such an obstacle exists, the Court must determine whether the promisee knew of its existence, rendering reliance unjustifiable. *Id.* The promisee is not, however, required to investigate even if an investigation would reveal the falsity of the promisor's representation unless the falsity is "readily apparent or obvious." *Hurst*, 337 B.R. at 133-34; RESTATEMENT (SECOND) OF TORTS § 540.

Finally, the creditor must establish that its loss sustained is the "proximate result" or legal cause of the debtor's representation. *State of Texas v. Am. Tobacco Co.*, 14 F. Supp. 2d 956, 967 (E.D. Tex. 1997). Proximate cause is "largely a question of foreseeability." *First Nat'l Bank of Omaha v. O'Brien (In re O'Brien)*, 555 B.R. 771, 782-783 (Bankr. D. Kan. 2016) (citing RESTATEMENT (SECOND) OF TORTS § 548A). Reliance on the debtor's representation is a proximate cause of the creditor's loss "if the evidence shows that the loss was a reasonably foreseeable consequence of the plaintiff's reliance." *Am. Tobacco Co.*, 14 F. Supp. 2d at 967.

### a. The Debt is Nondischargeable because The Womacks made a False Representation and/or False Pretense.

A false representation or false pretense under § 523(a)(2)(A) consists of (1) a knowing and fraudulent falsehood; (2) describing past or current facts; (3) that the creditor relied upon. *Pentecost*, 44 F.3d. at 1293. Notably, false representations and false pretenses must "encompass statements that falsely purport to depict current or past facts." *In re Bercier*, 934 F.2d 689, 692

18

(5th Cir. 1991). The Court focuses on the subjective mindset of the promisor to determine whether a knowing and false representation was made. ***Rifai***, 604 B.R. at 307 (citing ***Higgins v. Nunnelee*** (***In re Nunnelee***), 560 B.R. 277, 285 (Bankr. N.D. Miss. 2016)). A representation is fraudulent if the debtor "knows or believes" that the information is not as represented, or "does not have the basis for his representation as stated or implied." ***Mercer***, 246 F.3d at 407. Furthermore, a debtor's false representation of intent to execute contractual duties may satisfy the first element under § 523(a)(2)(A). ***Hurst***, 337 B.R. 131-32.

Other courts in Texas recognize a further distinction between false representations and false pretenses. ***Rifai***, 604 B.R. at 307. Courts reason that a claim of "false representation involves an express statement, while a claim of false pretenses may be premised on misleading conduct without an explicit statement." ***Id.*** (citing ***Wright v. Minardi*** (***In re Minardi***), 536 B.R. 171, 187 (Bankr. E.D. Tex. 2015)).

### 1. The Bank Cannot Recover Based on The Womacks' False Representation That ME Interest was Woman-Owned.

The Bank first claims the debt is not dischargeable because the Womacks falsely represented that ME Interest was a woman-owned business. The Court finds the Bank failed to prove all the elements of a false representation claim by a preponderance of the evidence.

While the Womacks' false representation describes past or current facts related to the company, there is insufficient evidence to show (1) that the Womacks intended to deceive the Bank with the representation, (2) that the bank relied on the representation, and (3) that the Bank's loss was a proximate cause of the representation.

The evidence does not indicate the Womacks' intent to deceive the Bank. At trial the Womacks conceded that they portrayed ME Interest as a woman-owned company in a local

19

business journal article.[20] Furthermore, the Womacks admitted that they failed to follow through with the Texas requirements to officially qualify as majority woman-owned; however, it does not appear that they made the representation to the Bank with the purpose of securing the SBA Loan.

Moreover, the Bank did not actually rely on the Womacks' representation. The Bank failed to demonstrate that it would not have granted the SBA Loan in the absence of the Womacks' representation that ME Interest was a woman-owned business. In fact, the evidence reveals that the Bank relied more on Mrs. Womack's involvement in the company, rather than how accurately the company was marketed. Even though the business article featuring ME Interest may render the Bank's reliance justifiable, *Acosta* requires both actual and justifiable reliance for a claim to succeed under § 523(a)(2)(A). 406 F.3d at 372.

Finally, the Bank's loss is not a proximate cause of the representation. The default on the SBA Loan is not a foreseeable result of the Womacks' representation that ME Interest was a woman-owned business. Furthermore, there is insufficient evidence linking the Bank's loss to the Womacks' representation.

Because the Bank failed to prove every element under § 523(a)(2)(A) by a preponderance of the evidence, the Bank cannot recover on its first claim.

### 2. The Debt is Nondischargeable for False Representations and False Pretenses based on The Womacks' Representation That They Both Actively Participated in ME Interest.

The Bank also claims the debt is nondischargeable for false pretenses and false representations based on the Womacks' representation that Mr. and Mrs. Womack both actively participated in ME Interest. The Court finds the Bank proved all elements by a preponderance of the evidence. As a result, the debt is nondischargeable.

---

[20] *See* Plaintiff's Ex. 1 at 2 (San Antonio Business Journal article applauding ME Interest as a majority woman-owned business).

First, the Womacks agreed in section 5.8 of the Loan Agreement that they would not, at any time, cease to be involved in the day-to-day executive management of ME Interest.[21] The covenant indicated that the Womacks were actively participating in the company at the time the agreement was made—a description of current fact.[22] At trial, however, Mrs. Womack testified that she worked full time as a school principal and only helped with the business in a limited capacity. Mrs. Womack also stated that she trusted her husband's business judgement, indicating that she was not actively involved in the decision-making process for ME Interest. The Womacks each testified that Mrs. Womack was not involved in the original loan negotiation meetings and merely signed the document at the request of her husband. Moreover, The Bill of Sale listed Mr. Womack as the owner of 95% of the company and did not indicate that Mrs. Womack was an interest holder.[23] When asked at trial about their shares in the company, Mr. Womack admitted that there was not a partnership agreement for ME Interest, yet Mrs. Womack signed the Loan Agreement as though she were a part owner. The express misrepresentation of the Womacks' level of participation in ME Interest combined with their conduct constitute a false representation and false pretense under § 523(a)(2)(A).

Second, the evidence indicates the Womacks' intent to deceive the Bank. At trial Mr. Thompson testified that banks require certain covenants to ensure the businesses that obtain SBA Loans operate as represented when the agreement is entered. Although Mr. Womack testified that he and Mrs. Womack did not intend to deceive the Bank, the Womacks knew Mrs. Womack's level of involvement was not as represented in the agreement. Mr. Womack admitted at trial that before they applied for the SBA Loan, they stopped trying to qualify as a majority woman-owned

---

[21] *See* Plaintiff's Ex. 2 at 9.
[22] *Id.*
[23] Plaintiff's Ex. 7 at 1.

business when they realized that Mrs. Womack had to be involved in the day-to-day management of ME Interest. This further substantiates that the Womacks knew Mrs. Womack was not actively involved in the everyday performance of ME Interest when they secured the refinancing from the Bank. Moreover, Mr. Womack is a businessman with knowledge of loan agreements and should have known that the statement indicating their respective involvement in the company would influence the Bank's decision to grant the SBA Loan. Further, Mrs. Womack knew that she contributed to ME Interest in a limited manner, not as a part owner. Considering the circumstances in the aggregate, the Womacks' false statements and conduct indicate an intent to deceive the Bank.

Third, the Bank actually and justifiably relied on the Womacks' false representation. At trial, Mr. Thompson explained that the Bank relies on the management of businesses financed through SBA Loans, requiring certain guarantees from each business owner. Mr. Thompson further indicated that the operation and management of a business is a substantial factor considered in the approval process. Thus, the Bank actually relied on the Womacks' representation that they were both significantly involved in the everyday supervisory tasks of ME Interest. Furthermore, Mr. Thompson testified that the Bank was aware of Mrs. Womack's background as an educator. The Bank, however, did not have a duty to investigate if she was still employed full time at the time of agreement. In fact, the business article describing ME Interest as woman-owned bolstered the Womacks' false representation that both Mr. and Mrs. Womack were involved in the day-to-day execution of the company.[24] The falsity of the Womacks' representation was not readily apparent or obvious at the time the agreement was made. Therefore, the Bank also justifiably relied on the Womacks' misrepresentation.

---

[24] *See* Plaintiff's Ex. 1 at 2.

Finally, the Bank sustained a loss as a proximate cause of the Womacks' false representation that Mrs. Womack was actively involved in the company. Because the Bank relied on the operation of ME Interest, it approved the SBA Loan with the understanding that the company was owned and managed by two individuals. Furthermore, the Bank understood that Mrs. Womack's educational background allowed ME Interest to effectively market its services to school districts. Without Mrs. Womack as an executive manager of ME Interest, there was less accountability concerning the execution of the daily company operations. Consequently, the default on the loan was a reasonably expected result when the Womacks failed to represent the true management structure of ME Interest.

Therefore, the debt is nondischargeable under § 523(a)(2)(A) due to the Womacks' false representations and false pretenses.

**b. The Debt is Nondischargeable Because the Womacks Committed Actual Fraud.**

In its last § 523(a)(2)(A) claim, the Bank alleges the debt is nondischargeable because the Womacks committed actual fraud. The court finds that the Bank proved each element by a preponderance of the evidence.

In contrast to false representations and false pretenses, actual fraud encompasses promises of future actions "which, at the time they were made, [the debtor] had no intention of fulfilling." *Rifai*, 604 B.R. at 307. Moreover, the Supreme Court held that the term "actual fraud" contains two components: actual and fraud. *Ritz*, 578 U.S. at 360. The word "actual" denotes "any fraud that involv[es] moral turpitude or intentional wrong." *Id.* "Actual fraud" further indicates that implied fraud or fraud in law is insufficient for § 523(a)(2)(A) purposes. *Id.* Additionally, the requisite intent to satisfy "actual fraud" may be inferred from the party's acts after the representation was made. *Rifai*, 604 B.R. at 307. Therefore, "anything that counts as 'fraud' and is

23

done with wrongful intent is 'actual fraud.'" *Ritz*, 578 U.S. at 360.

First, in sections 5.8 and 5.9 of the SBA Loan Agreement, the Womacks represented that they would not sell more than 10% of their interest or cease to manage their company.[25] Furthermore, the Womacks represented in the Security Agreement that the parties would not sell any of the company's collateral without the consent of the Bank.[26] Shortly after signing the documents, however, Mr. Womack sold 85% of his interest without consent of the Bank and ceased managing ME Interest.[27] Therefore, the Womacks' fraudulent promises of future actions constitute actual fraud under § 523(a)(2)(A).

Second, the evidence reveals the Womacks' intent to deceive. At trial, Mr. Womack admitted the business article catalyzed interest in the company but claimed ME Interest was often solicited by purchasers.[28] Mr. Womack, however, sold the business and ceased acting in a managerial capacity shortly after obtaining the loan.[29] Although the Womacks maintained that the marketability of ME Interest was not a motivation in securing the SBA Loan, it appears in hindsight that the loan consolidation was not for the benefit of the company. Rather, the Womacks' actions reveal that they acquired the loan to make ME Interest more desirable for purchasers. Considering the Womacks' conduct in the aggregate, their false representations and subsequent actions indicate that they had no intention of fulfilling the covenants made in either the Loan or Security Agreement.

Third, the Bank actually and justifiably relied on the Womacks' representations. At trial Mr. Thompson stated that the Bank utilizes security agreements as a secondary form of repayment

---

[25] Plaintiff's Ex. 2 at 9.
[26] Plaintiff's Ex. 3 at 4.
[27] Plaintiff's Ex. 7 at 1 and Plaintiff's Ex. 10 at 1.
[28] *See* Plaintiff's Ex. 1 at 2.
[29] *See* Plaintiff's Ex. 7 at 1 and Plaintiff's Ex. 9 at 1.

in the event a business fails to service its loan. Thus, the Bank actually relied on the Womacks'
representation that they would not sell or discontinue their involvement in ME Interest.
Furthermore, the falsity of the Womack's representation was not readily apparent at the time the
agreement was made to render the Bank's reliance unjustifiable. There is no evidence to indicate
that the Womacks disclosed solicitations for their company or any other indication that the
Womacks considered selling the business. As a result, the Bank actually and justifiably relied on
the Womacks' false statements.

Finally, the Bank suffered a loss as the proximate result of the Womacks' false statements.
By selling ME Interest without the consent of the Bank, Mr. Womack precluded the Bank from
being a part of the sale agreement. Though Mr. Womack repeatedly testified he believed the
purchaser would assume the loan, without being party to the sale, the Bank could not modify the
loan agreement to ensure the buyer would be responsible for the note. Furthermore, when Mr.
Womack ceased his managerial role, he lost his ability to service the loan, and the operation of the
business eventually terminated along with its cash flow. Ultimately, it was reasonably foreseeable
that the Womacks would default on the SBA Loan as a result of their false statements about selling
and managing ME Interest. Additionally, there was uncontroverted evidence that the remaining
loan balance of $1,098,360.22 is the loss suffered by the Bank because of the Womacks' default.[30]

Accordingly, the Court finds the debt is not dischargeable under § 523(a)(2)(A) because
the Womacks committed actual fraud.

## II. Exception to Discharge Under 11 U.S.C. § 523(a)(6) Willful and Malicious Injury

Under § 523(a)(6), a debt is nondischargeable if the Plaintiff can demonstrate a "willful
and malicious injury by the debtor to another entity or to the property of another entity."

---

[30] *See* Plaintiff's Ex. 16 at 2.

In other words, debts for "willful and malicious injury" are not dischargeable in a Chapter 7 case. 11 U.S.C. § 523(a)(6); *Kawaauhau v. Geiger*, 523 U.S. 57 (1998). Under *Geiger*, the word "willful" modifies the word "injury," meaning a debtor must have intended not only to commit an act resulting in the plaintiff's injury, but to also inflict the injury itself. 523 U.S. at 61. Accordingly, "debts arising from recklessly or negligently inflicted injuries do not fall within the compass of § 523(a)(6)." *Id.* at 64.

The Fifth Circuit employs a two-part test to determine willful and malicious injury. *Williams*, 337 F.3d 504 (5th Cir. 2003). An injury is willful and malicious if the plaintiff proves "either an objective substantial certainty of harm or a subjective motive to cause harm." *Id.* at 509 (citing *In re Miller*, 156 F.3d 598, 603 (5th Cir. 1998)). In *Berry v. Vollbracht* (*In re Vollbracht*), the Fifth Circuit restated the test for willful and malicious injury as involving an inquiry "of whether there exists 'either an objective substantial certainty of harm or a subjective motive to cause harm' on the part of the debtor." 276 F. App'x. 360, 361–62 (5th Cir. 2007). For an injury to be "willful and malicious," it must satisfy the two-part test and not be sufficiently justified under the circumstances to render it not willful and malicious. *Id.* at 362.

### a.  There Was No Objective Substantial Certainty of Harm to the Bank

To establish an objective substantial certainty of harm, the court must "analyze whether the defendant's actions, which from a reasonable person's standpoint were substantially certain to result in harm, are such that the court ought to infer that the debtor's *subjective* intent was to inflict a willful and malicious injury on the plaintiff." *In re Powers*, 421 B.R. 326, 335 (Bankr. W.D. Tex. 2009)(emphasis in original).

Here, the Bank alleges that retaining the proceeds from the sale was unreasonable and thus the Court can infer that the Womacks intended to cause the Bank harm. The Court disagrees. Given

the agreement between the Womacks and the buyers that the buyers would assume payments on the loan, it is not substantially certain that the Bank would be harmed. In theory, the buyers would have continued making the payments on behalf of the borrower ME Interests and the Bank would have been paid back in full. Because the arrangement ultimately went awry does not mean that the Womacks' conduct was substantially certain to cause the Bank's harm.

Had the Womacks taken the proceeds from the sale and immediately put them towards the balance of the loan that in their minds was being assumed, the buyers of the company would receive more value from the sale than they bargained. In other words, the Womacks would be giving the company, and by extension the buyers, a benefit by reducing the company's liabilities by the amount the buyers paid for a controlling interest in the business. Thus, the Womacks' retention of the sales proceeds is not unreasonable. Although the loan agreement prohibits the sale of the business, it does not provide that any sales proceeds be turned over to the bank in the event of a sale.

The Bank's argument that it was not able to consent to the assumption of the loan by the buyers because it was not a party to the sale is well taken but is more appropriate for a breach of contract action and carries little weight when determining the reasonableness of the Womacks' conduct. Relatedly, it is true that the Womacks are held to know and understand every provision of the loan agreement. Thus, the Womacks are held to have known that selling the business would be a breach of the loan agreement and thus an act of default. The Womacks' failure to cure the default is no doubt an injury to the Bank, but the reasonable person, under the circumstances presented, would think that the Bank's rights were being protected. Any arguments that the Womacks knew that they could not sell the business and did it anyway are breach of contract issues.

Therefore, the Court finds that the Womacks conduct in retaining the sales proceeds was reasonable, and not substantially certain to cause the Bank harm.

### b. There Was No Subjective Motive to Cause Harm to the Bank

Courts find a subjective motive to cause harm when a defendant acts "deliberately and intentionally, in knowing disregard of the rights of another." *In re Gharbi*, No. 08-11023-CAG, 2011 WL 831706 (Bankr. W.D. Tex. Mar. 3, 2011), *aff'd*, Cause No. A-11-CA-291-LY, 2011 WL 2181197 (W.D. Tex. June 3, 2011). "Merely because a tort is classified as intentional does not mean that any injury caused by the tortfeasor is willful." *Williams*, 337 F.3d at 509 (citation omitted).

From the evidence adduced, it does not appear that the Womacks had a subjectively intended to cause the Bank any harm. As this Court has previously held, a finding of subjective motive to cause harm requires acting "in knowing disregard of the rights of another." *Gharbi,*

The testimony from Mr. Womack was abundantly clear that at all times he had the rights of the Bank in mind. His conduct bolsters this conclusion. For example, Mr. Womack negotiated the sale carefully to ensure that the buyer would continue to service the note. The fact that the buyer's commitment to do so fell through does not mean that Mr. Womack had an intent to cause the Bank harm. Additionally, once it became apparent that the buyers were no longer going to service the note, Mr. Womack stepped in to ask the Bank to work with him. Mr. Womack made subsequent payments to the Bank, despite contracting the responsibility to service the note to a third party. Lastly, the Womacks assigned any recovery from their state court lawsuits against the buyers and broker to the Bank.

Notably, Mr. Womack never denied liability for the personal guaranty and reiterated his commitment to responsibility for the note. While there were parts of Mr. Womack's testimony that

28

were not credible, the Court finds the testimony regarding his intent to ensure payment to the Bank credible. The Bank argues that Mr. Womack's conduct after the default is irrelevant because the Womacks retained and concealed the sales proceeds from the Bank. The Court notes that the testimony from both the Womacks regarding what happened to the sales proceeds was less than credible. The Womacks maintain that the funds were used for living expenses and attorney's fees. It seems unlikely that the Womacks would have spent $650,000 in two years on living expenses and attorney's fees in San Antonio, Texas. Regardless, as discussed above, retaining the sales proceeds was reasonable under the circumstances and does not affect the credibility of Mr. Womack's testimony regarding his intent to ensure payment on the note.

Lastly, the Bank argues that Mr. Womack's seemingly good faith conduct should be disregarded because the loan agreement forbids the Womacks from selling the business and the Womacks chose to sell the business anyway. The Court agrees with the Bank that the Womacks are held to know and understand the provisions of the contract they signed, whether they read it or not. Regardless, the Court finds that to the extent Mr. Womack's conduct was in violation of the loan agreement, those issues are more appropriate in a breach of contract action than a nondischargeability action.

Thus, the Court holds that there the Womack's did not possess the requisite subjective motive to cause the Bank harm.

## CONCLUSION

In summary, the Womacks gave false misrepresentations to the Bank during the loan approval process regarding Mrs. Womack's level of involvement in ME Interests. Additionally, the Womacks committed actual fraud by promising to retain ownership of the business, while actually intending to sell the business. Lastly, the Womacks did not inflict a willful and

malicious injury on the Bank under either the objective test or subjective test.

Accordingly, IT IS ORDERED that the Bank is entitled to a judgment that the Womacks' debt to the Bank, the balance of which is $1,237,679.20, is nondischargeable under 11 U.S.C. § 523(a)(2)(A).

IT IS FURTHER ORDERED that relief in the amount of $650,000 under § 523(a)(6) is DENIED.

IT IS FURTHER ORDERED Plaintiff may seek its attorney's fees and costs pursuant to Bankruptcy Rule 7054 and Local Rule 7054 within 14 days of entry of this Memorandum Opinion and Order as allowed by applicable law.

IT IS FURTHER ORDERED that all other relief is DENIED.

# # #